Christopher H. Meyer [ISB No. 4461]
Preston N. Carter [ISB No. 8462]
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Office: (208) 388-1200
Fax: (208) 388-1300
chrismeyer@givenspursley.com
prestoncarter@givenspursley.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MIDAS GOLD IDAHO, INC., IDAHO GOLD RESOURCES COMPANY, LLC, and STIBNITE GOLD COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA; U.S. DEPARTMENT OF AGRICULTURE; THE UNITED STATES FOREST SERVICE; SONNY PERDUE in his official capacity as U.S. Secretary of Agriculture; and VICKI CHRISTIANSEN in her official capacity as the Chief of the United States Forest Service. <br><br> Defendants. | No. <br><br><br> **COMPLAINT AND JURY DEMAND** |

### INTRODUCTION

1.      Plaintiffs Idaho Gold Resources Company, LLC ("IGRC"), Stibnite Gold Company ("SGC"), and Midas Gold Idaho, Inc. ("MGII") (hereinafter collectively referred to as "Midas" or "Plaintiffs") bring this action under 33 U.S.C. § 1365(a), the citizen enforcement provision of the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), against Defendants the United States of America, United States Department of Agriculture, the United

COMPLAINT - 1
15270732_1.docx [10877.6]

States Forest Service ("USFS"), U.S. Secretary of Agriculture Sonny Perdue, and USFS Chief Vicki Christiansen in their official capacities ("Defendants").

2.     The CWA prohibits the "discharge of any pollutant by any person," 33 U.S.C. § 1311(a).  The discharge of a pollutant is "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12)(A).  "Navigable waters" is defined as "the waters of the United States, including the territorial seas."  *Id.* § 1362(7).  A "point source" is a "discernible, confined and discrete conveyance."  *Id.* § 1362(14).  A party who obtains and complies with a National Pollutant Discharge Elimination System ("NPDES") permit is exempt from the general prohibition on point source pollution.  *Id.* §§ 1311(a), 1342(a)(1).

3.     On August 8, 2019, the Nez Perce Tribe ("Tribe") filed a suit against Midas captioned *Nez Perce Tribe v. Midas Gold Corp.*, No. 01:19-cv-307 (D. Idaho) ("Tribe's Suit") alleging that in violation of the CWA, Midas (and their parent entity, Midas Gold Corp. ("MGC")) has discharged and continues to discharge pollutants from multiple point sources at the Stibnite Gold Project site ("the Site") into the East Fork South Fork Salmon River ("EFSFSR") and its tributaries without authorization by a valid NPDES permit(s).

4.     The Tribe seeks declaratory and injunctive relief prohibiting Midas and MGC from discharging pollutants into the EFSFSR and its tributaries without obtaining and complying with a valid NPDES permit(s).  The Tribe also seeks CWA civil penalties, under CWA § 309(d), 33 U.S.C. § 1319(d), against Midas and MGC, jointly and severally, for each and every violation committed, to be paid to the U.S. Treasury.  Finally, the Tribe seeks an award of litigation costs including attorney and expert witness fees, under CWA § 505(d), 33 U.S.C. § 1365(d), and any other applicable cost and fee recovery statutes.

5.      Plaintiffs IGRC and SGC hold patented and unpatented mining claims in the Stibnite-Yellow Pine Mining District ("District"), which is located within the Boise and Payette National Forests.  Four of the point sources alleged in the Tribe's Suit—referred to by the Tribe as the Hangar Flats Tailings Pile, Defense Minerals Exploration Administration ("DMEA") Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel—are situated fully or partially on National Forest System ("NFS") lands within these Forests that are subject to unpatented mining claims.

6.      The lands underlying the unpatented mining claims where the Hangar Flats Tailings Pile, DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel are located are NFS lands owned by the United States and managed by USFS.

7.      The EFSFSR and its tributaries, Sugar Creek and Meadow Creek, are each a navigable water.  Due to historic mining activities and/or natural mineralization in the land in this area, mineral constituents such as aluminum, arsenic, antimony, cyanide, iron, manganese, mercury, and thallium have entered the EFSFSR and its tributaries from some of the lands subject to IGRC and SGC's mining claims at concentrations above applicable water quality criteria.  Such contributions have occurred on multiple occasions during the past five years and are ongoing on at least one of those properties.  Each of these pollutants can negatively impact the health of fish, other aquatic biota, birds, mammals, and humans.

8.      IGRC and SGC's holdings in the District include patented mining claims on private land that are downstream of the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel.  Discharges from these locations undermine Midas's efforts and vision to restore the Site and environment concurrent with all future mining phases under its Plan of Restoration and Operations ("PRO") which is now undergoing review by

USFS under the 36 C.F.R. § 228 Subpart A regulations.  Midas may be forced to incur additional costs to remedy the waters impacted by the discharge of pollutants at the DMEA Adit and Waste Rock Dump, the Bonanza Adit, the Cinnabar Tunnel, and unpatented portions of the Hangar Flats Tailings Pile in order to complete the planned restoration as envisioned in its PRO.  Any past or ongoing discharges therefore harm IGRC and SGC's rights as landowners and may require MGII to perform additional work to address water quality issues at the Site.

**JURISDICTION AND VENUE**

9.      Jurisdiction is proper in this Court under the CWA, 33 U.S.C. § 1365(a), which vests U.S. district courts with jurisdiction over citizen enforcement actions like the one at issue in this case.

10.     The requested relief is proper under the CWA, 33 U.S.C. § 1365(a), and under 28 U.S.C. §§ 2201-2202 because Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that USFS has discharged and continues to discharge pollutants without a valid NPDES permit(s).

11.     Plaintiffs are citizens under the CWA.  33 U.S.C. § 1365(g).

12.     As required by the CWA, Midas provided Defendants with notice of its intent to sue sixty days prior to filing this Complaint.  33 U.S.C. § 1365(b)(1).  At the same time, Midas also provided notice of the impending action to the United States Environmental Protection Agency ("EPA") and Idaho Department of Environmental Quality ("IDEQ") officials, as required by the CWA.  *Id.  See* Notice of Intent, June 11, 2020 and Attachments thereto, which are attached hereto as Exhibit A ("Ex. A"), and incorporated by reference.  Neither agency has commenced an action that constitutes diligent prosecution to redress Defendant's CWA likely violations.  Therefore, this action is permitted to commence under the CWA.

13.     The United States and USFS have waived sovereign immunity under 33 U.S.C. § 1365(a)(1).

14.     Venue is proper in this Court under the CWA, 33 U.S.C. § 1365(c)(1), because the alleged point source pollutant discharges are located within the District of Idaho.

## PARTIES

### Midas Gold

15.     Plaintiffs MGII and IGRC are Idaho companies and wholly owned subsidiaries of MGC.[1]

16.     Plaintiff SGC is an Idaho company and wholly owned subsidiary of IGRC.

17.     MGII was incorporated in the State of Idaho to provide exploration and development services to the Stibnite Gold Project.  MGII has service agreements with both SGC and IGRC under which it is engaged to provide certain professional, human resources, administration, accounting, exploration, regulatory, engineering and other services, including on SGC's and IGRC's patented and unpatented claims in the District, that would otherwise be reasonably inferred to include the scope of the services contemplated and as described in the services agreement.

18.     IGRC is an Idaho LLC formed with a purpose of holding patented and unpatented claims in the District, including the West End Deposit and a majority of the Stibnite Gold Project exploration targets. IGRC has rights to certain patented and unpatented mining claims in the District.

---

[1] MGC is not a Plaintiff in this suit.  MGC has no landholdings at issue in this case and was organized to locate, acquire, and develop mineral properties located principally in the Stibnite Mining District in Valley County, Idaho.  Its principal business activity continues to be the advancement of the Plaintiffs' Proposed Mine in Valley County, Idaho.

19.     SGC was formed as an Idaho company with a purpose of holding patented and unpatented claims in the District, including the Hanger Flats and Yellow Pine Deposits, the Fern prospect, and an option to acquire the historic Cinnabar mine.  SGC has rights to certain patented and unpatented mining claims in the District.

**Defendants**

20.     The United States is a sovereign government that owns legal fee simple title to NFS lands managed by USFS.

21.     U.S. Department of Agriculture is a cabinet-level Department within the executive branch of the federal government and is an agency or instrumentality of the United States.

22.     USFS is an administrative agency within the Department of Agriculture and is an agency or instrumentality of the United States.  USFS administers all NFS lands on behalf of the United States.  USFS is charged with managing the public lands and resources of the Boise and Payette National Forests in accordance and compliance with federal laws and regulations.

23.     Portions of the District and the Site are located on NFS land within the Payette and Boise National Forests, which are a part of USFS.

24.     The United States owns the paramount fee title to the lands on which third-parties hold unpatented mining claims on NFS lands.  The United States is therefore the CWA "owner" of the lands subject to those claims.

25.     USFS manages, directs, or conducts operations on NFS lands subject to unpatented claims, including operations specifically related to pollution, and makes decisions about compliance with environmental regulations, and is therefore an "operator" of those locations.

26.     USFS operates NFS lands subject to unpatented claims on behalf of the United States.

27.     Defendant Sonny Perdue is the Secretary of the United States Department of Agriculture, and in his official capacity is ultimately responsible for NFS land, including the Payette and Boise National Forests.

28.     Defendant Vicki Christiansen is the USFS Chief, and in her official capacity is responsible for NFS land, including the Payette and Boise National Forests.

## LEGAL BACKGROUND

### CWA

29.     Congress adopted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into navigable waters.

30.     The CWA prohibits the "discharge of any pollutant by any person" to navigable water, unless authorized by a valid NPDES permit(s). 33 U.S.C. §§ 1311(a), 1342(a).

31.     "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  "Pollutant" is defined to include solid, chemical, and industrial waste discharged into water.  *Id*. § 1362(6).  A "point source" is "any discernible, confined and discrete conveyance," *id*. § 1362(14), and "navigable waters" are defined as "the waters of the United States," *id*. § 1362(7).

32.     The CWA's citizen suit provision authorizes "any citizen" to "commence a civil action on his own behalf" in federal district court against "any person "[]including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution[,]" who is alleged to be in violation of "an effluent

standard or limitation" of the Act. 33 U.S.C. § 1365(a)." "'[C]itizen' means a person or persons having an interest which is or may be adversely affected." *Id*. § 1365(g).

33.     Citizens are required to provide notice of any alleged violations sixty days prior to commencing suit. 33 U.S.C. § 1365(b).

34.     A person is liable under the CWA for discharging pollutants without a NPDES permit if that person is an "owner or operator of any 'facility or activity' subject to regulation under the NPDES program."  40 C.F.R. § 122.2.  "*Facility or activity* means any NPDES 'point source' or any other facility or activity (including land or appurtenances thereto) that is subject to regulation under the NPDES program." *Id*.

35.     A person or entity is an operator of a facility if it "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998) (per curiam).

36.     The CWA provides for the imposition of civil penalties of up to $37,500 per violation per day that occurred through November 2, 2015, and up to $54,833 per violation per day that occurred after November 2, 2015.  33 U.S.C. § 1319(d) (adjusted by 40 C.F.R. § 19.4 and the Civil Monetary Penalty Inflation Adjustment Rule, 84 Fed. Reg. 2050, 2056-60 (Feb. 6, 2019)).

37.     District courts may issue injunctions to "enforce such [CWA] effluent standard[s] or limitation[s]."  33 U.S.C. § 1365(a); *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 999–1000 (9th Cir. 2000).

38.     The CWA does not contain a limitations period for citizen suit enforcement actions, but 28 U.S.C. § 2462 provides a five-year statute of limitations for a suit or proceeding for the enforcement of any civil fine or penalty.

**Framework for Mining on USFS Land**

39.     An unpatented mining claim is a private possessory interest that can be established on lands owned by the United States that are open to mineral entry under the General Mining Law and that has been located in accordance with applicable law and regulations.  Under the General Mining Law, a citizen (including a corporate entity) who holds an unpatented mining claim has a conditional right to possess, use, and otherwise occupy their claim for mineral exploration and development purposes, subject to the environmental protection provisions in the applicable surface management regulations, and applicable federal and state environmental laws.  The surface of the federal lands upon which an unpatented mining claim is located is not private property.

40.     If an unpatented mining claim is located on NFS land, ownership of the land is retained by the United States and the land continues to be administered and managed by USFS.

41.     The United States and USFS have the right to manage both the land surface and surface resources subject to an unpatented mining claim, and do so through regulations of the Secretary of Agriculture contained in 36 C.F.R. § 228 Subpart A.  *See also* 30 U.S.C. § 612(a) (stating holders of unpatented mining claims may not use property for purposes unrelated to mining); *id*. § 612(b) (stating United States retains rights in surface and vegetative estates of unpatented claims).  These regulations include a requirement to obtain USFS permission for operations that might significantly disturb the surface resources.  *See* 36 C.F.R. §§ 228.4–228.5 (mining activities require permit with an approved plan of operations); *id.* § 251.50 (non-mining operations also require approval and permit).

42.     USFS promulgated the 36 C.F.R. § 228 Subpart A regulations under the authority of the Organic Administration Act of 1897, 16 U.S.C. § 551 et seq.

## BACKGROUND FACTS

### The Stibnite-Yellow Pine Mining District

43.     The Site is located in the District, in Valley County, 92 miles by air northeast of Boise and 10 miles east of Yellow Pine, Idaho.  Midas's holdings in the District encompass both unpatented claims on NFS lands and patented mining claims on private land held by IGRC and SGC.

44.     Portions of the District and the Site are within the Payette and Boise National Forests.  The Boise National Forest was created in 1908 from portions of the Payette National and Sawtooth Forest Reserves.

45.     From the 1920s through the 1950s, the Site was mined for gold, silver, antimony, tungsten, and mercury. The Site was again mined from the 1980s to the 1990s.  This cumulative mining activity created a disturbed footprint with open pits, waste rock dumps, spent heap leach piles/pads, and tailings piles that remain on the landscape today.

46.     In September 2016, MGII submitted its PRO for the Stibnite Gold Project, thus beginning the process to seek USFS approval to construct, mine, operate, and reclaim and restore the Site.   Since then, USFS has been working with MGII and other local, state and federal regulatory agencies to review the PRO, prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, as part of its consideration of Midas's PRO.   Once the PRO is approved by USFS under 36 C.F.R. § 228 Subpart A regulations, MGII's implementation of the PRO must be carried out in compliance with all applicable federal and state environmental laws, including the CWA.  Until USFS approves the PRO, MGII is precluded from carrying out surface disturbing activities at the Site, including surface disturbing actions which may address and remedy potential point source discharges of pollutants under the CWA.

COMPLAINT - 10

47.     Midas's vision for the Stibnite Gold Project is to undertake the restoration of the abandoned, historically impacted Site before, during, and after the development of a modern mining operation that produces gold, silver, and the strategic mineral antimony.  Central to this vision is the idea of environmental stewardship throughout the life of the Project.  MGII's plan for the restoration and operation of the Site means it will conduct site cleanup, mining, ore processing, and reclamation and restoration work at the Site that will leave surface streams in better condition than what currently exists.

48.     The restoration and mining operation proposed by MGII includes source removal and, in certain areas of the Site, recovery and reprocessing of legacy tailings and reuse of waste rock and spent ore left behind by previous mining operations predating Midas's involvement in the Site.  Many of the most problematic legacy impacts in the District are related to the exploration, development, and operation of antimony and tungsten mining during World War II and the Korean War that was encouraged, funded, and, in some cases, directly undertaken by federal agencies on NFS land.

49.     The Site has been the subject of multiple site environmental characterization studies undertaken by federal and state agencies between 1974 and 2017, in addition to five engineering evaluation/cost analysis studies between 1999 and 2006.  The Site also has been the subject of three major CERCLA consent decrees to address select issues of greatest priority.

50.     Those consent decrees resulted in cleanup activity by prior mine operators (or their successors), including Mobil Oil Corporation, the Estate of J.J. Oberbillig, and the Bradley Mining Company.  These efforts were conducted under the oversight of EPA, and activities on NFS land required the consent and approval of USFS.

51.     Cleanup efforts in the District were not comprehensive, and legacy areas of concern remain.  Conditions of environmental concern exist on Midas's holdings in the District due to activities that predate Midas's formation and involvement in the District.

52.     Midas has made, and will continue to make, investments in restoring the water quality in the District and addressing harms to the environment, including the fisheries, that were caused by legacy mining operations.  This restoration work is a fundamental aspect of the Stibnite Gold Project as proposed in Midas's PRO.  Midas is committed through the PRO to the cleanup of the Site as an early priority.  Other cleanup activity is envisioned to take place in advance of new mining operations, and is expected to continue throughout the construction, operation, and closure stages of the Project.  This integrated approach is designed to achieve a net environmental benefit for the District.

53.     As proposed in Midas's PRO, both concurrent and post-operations closure and reclamation will be undertaken so that the Site is left with a self-sustaining natural ecosystem, enhanced habitat for the natural fish and wildlife populations, and improved water quality.  Midas plans to develop water management infrastructure at the Site, relocate and reuse spent ore and construct a lined tailings storage facility, modify stream channels to reduce sedimentation, restore wetland function and reestablish fish passage that has otherwise been blocked for decades.

54.     Even during mining, Midas plans to concurrently reconstruct stream channels, riparian areas, wetlands, and upland habitat.  Midas intends to perform work to help rehabilitate the salmon fishery in the District and create a sustainable ecosystem.

55.     Given the remote location of the Site, Midas will develop a water supply system that furnishes potable water, along with water for fire protection, exploration, surface mining (dust control), ore processing, and tailings transport, while maintaining a sufficient supply of good

quality water for the surrounding ecosystem by recycling the majority of the water used in all aspects of the Project.

56.     The NFS lands subject to the unpatented mining claims held by IGRC and SGC are managed, directed, and primarily controlled by USFS.  As holders of unpatented claims, IGRC and SGC must comply with USFS regulations in order to undertake certain actions on unpatented claims.  These regulations include a requirement to obtain USFS permission for operations that might significantly disturb the surface resources.  *See* 36 C.F.R. §§ 228.4–228.5 (mining activities require permit with an approved plan of operations); 36 C.F.R. § 251.50 (non-mining operations also require approval and permit).

57.     Upon information and belief, USFS conducts water management activities on NFS lands subject to unpatented mining claims of its own initiative and has even done so on NFS lands subject to unpatented claims held by Midas in the District.  Such actions demonstrate USFS's active management and operational control over those properties.

58.     Upon information and belief, USFS has undertaken actions directly, or funded or approved actions, related to certain of the alleged point sources including the Hangar Flats Tailings Pile.  Further, upon information and belief, USFS has approved the placement of tailings, waste rock, and spent ore on what were at the time of placement, and portions of which remain, NFS lands as well as private lands subject to patented claims.

59.     Upon information and belief, in 2003, USFS engaged in removal actions on the Hangar Flats Tailings Pile on land subject to patented mining claims subsequently held by SGC and on NFS lands subject to unpatented mining claims subsequently held by IGRC.  These actions included the dismantling of an abandoned smelter stack along with relocating contaminated soil associated with the smelter to other patented and unpatented properties.

COMPLAINT - 13
15270732_1.docx [10877.6]

60.     Upon information and belief, in 2005, USFS re-channelized the stretch of lower Meadow Creek where water from the Hangar Flats Tailings Pile allegedly enters it.  This work occurred on NFS lands subject to unpatented mining claims now held by IGRC.  USFS also relocated some mine tailings from this location to other affected patented properties in the District at that time.

61.     Upon information and belief, in 2009–2010 USFS performed earthmoving work on the lands underlying both patented and unpatented claims at the Hangar Flats Tailing Pile as part of a CERCLA removal action.  Upon information and belief, his work included covering legacy mining wastes with fill and filling in a ditch that had previously carried stormwater around contaminated portions of Hanger Flats Tailings Pile.  Upon information and belief, these actions likely created or contributed to the seep identified as YP-S-5 or allowed runoff water to saturate the fill and come in contact with legacy mining wastes.  Upon information and belief, USFS did not seek permission from Midas before performing this work.

*Hangar Flats Tailings Pile*

62.     The Hangar Flats Tailings Pile is a legacy tailings deposit area that sits adjacent to Meadow Creek within the District.  The Hangar Flats Tailings Pile is on the location of a historic tailings disposal area on the Site.  Later, a heap leach facility was constructed over top of the pre-existing tailings and remains there to this day.   Portions of the feature contain elevated concentrations of arsenic, antimony, aluminum, iron, manganese, and mercury.  The Hangar Flats Tailings Pile is not capped, so rain and snow melt infiltrate it.

63.     Two seeps are located near the base of the feature which contain elevated concentrations of arsenic, antimony, aluminum, iron, manganese, and mercury.  A seep is a discrete conveyance through which subsurface water reaches the surface.

64.     One of these seeps, identified as YP-S-5, is located on IGRC's unpatented claim on NFS lands.  On information and belief, other portions of the Hangar Flats Tailings Pile may also located on NFS lands.

65.     The United States and USFS have owned and operated portions of the land on which the Hangar Flats Tailings Pile, including YP-S-5, is located for at least the last five years.

66.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that pollutants have discharged from YP-S-5 into the EFSFSR on several occasions during the five years preceding the date of this Complaint.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges have been recurring and will continue until appropriate control measures are implemented.

67.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that the pollutants in this water have resulted from contact with legacy mining wastes.

68.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges from the Hangar Flats Tailings Pile are not authorized by a valid NPDES permit(s) and are not otherwise exempt from CWA permitting requirements.

### DMEA Adit and Waste Rock Dump

69.     The DMEA Adit and Waste Rock Dump are located within the boundaries of IGRC's unpatented mining claim(s) on NFS lands owned by the United States.  Adits are small exploratory tunnels bored into the mountainside, sometimes miles long, which are typically graded such that water could drains out through the adit opening.

70.     The DMEA Adit and Waste Rock Dump are located on NFS lands and are located in an area outside of the Project footprint, meaning it is not proposed for any planned disturbance as a part of the development of the Stibnite Gold Project.

71.     The United States and USFS have owned and operated the DMEA Adit and Waste Rock Dump for at least the last five years.

72.     Water from the base of the DMEA Adit contains aluminum, arsenic, antimony, iron, mercury, and manganese.  Water samples at a seep downgradient from the Waste Rock Dump contain aluminum, antimony, arsenic, iron, manganese, and mercury.  This seep is located on NFS land.  Water from this seep reaches the EFSFSR.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that the pollutants in this water have resulted from contact with legacy mining wastes.

73.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that pollutants have discharged from the DMEA Adit and Waste Rock Dump into the EFSFSR and have done so on several occasions during the five years preceding the date of this Complaint.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges have been recurring and will continue until appropriate control measures are implemented.

74.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges from the DMEA Adit and Waste Rock Dump are not authorized by a valid NPDES permit(s) and are not otherwise exempt from CWA permitting requirements.

*Bonanza Adit*

75.     A small seep, originating as a small pond on a bench on a hillside that has been

excavated across its face by legacy exploration activities, exists near the Bonanza Adit.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that this seep has a hydrological connection to the Bonanza Adit.

76.     The Bonanza Adit and nearby seep are located on IGRC's unpatented mining claims in the District on NFS land owned by the United States.  The Bonanza Adit and nearby seep are located in an area outside of the Project footprint meaning it is not proposed for any planned disturbance as a part of the development of the Stibnite Gold Project.

77.     The United States and USFS have owned and operated the Bonanza Adit and nearby seep for at least the last five years.

78.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that water discharged from the seep near Bonanza Adit contains pollutants as a result of contact with legacy mining wastes.

79.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that the Bonanza Adit's discharges reach Sugar Creek through shallow subsurface hydrologic connections.

80.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that pollutants have discharged from the Bonanza Adit into EFSFSR and have done so on several occasions during the five years preceding the date of this Complaint.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges have been recurring and will continue until appropriate control measures are implemented.

81.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges are recurring from the Bonanza Adit and will continue until appropriate control measures are implemented.

82.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges from the Bonanza Adit or the nearby seep are not authorized by a valid NPDES permit(s) and are not otherwise exempt from CWA permitting requirements.

### *Cinnabar Tunnel*

83.     The Cinnabar Tunnel is a legacy adit, the entrance to which is located east of the EFSFSR.  Water emerges from the Cinnabar Tunnel as a seep.  The Cinnabar Tunnel is located within the boundaries of SGC's unpatented mining claim(s) in the District on NFS lands owned by the United States.

84.     The United States and USFS have owned and operated the location of the Cinnabar Tunnel, including the seep from which the water emerges, for at least the last five years.

85.     The Cinnabar Tunnel discharges pollutants, including antimony and arsenic, into the EFSFSR at, at least, three discrete, identifiable points.

86.     Pollutants have been discharged from the Cinnabar Tunnel, including arsenic and antimony, into the EFSFSR on several occasions during at least five years preceding the date of this Complaint.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges have been recurring and will continue until appropriate control measures are implemented.

87.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these pollution discharges from the Cinnabar Tunnel are not

authorized by a valid NPDES permit(s) and are not otherwise exempt from CWA permitting requirements.

### East Fork South Fork Salmon River Watershed

88.     The EFSFSR is a perennial tributary of the South Fork Salmon River, which is a tributary to the Salmon River.

89.     The EFSFSR is navigable in fact and is a navigable water and Water of the United States.

90.     A number of streams comprise the headwaters of the EFSFSR which flow through NFS land and the District, including Sugar Creek and Meadow Creek, which are perennial streams and navigable waters.

91.     Water quality samples taken at the Site show elevated pollution levels in the EFSFSR and its tributaries, including elevated levels of aluminum, arsenic, antimony, cyanide, iron, manganese, mercury, and thallium.

92.     Environmental responsibility is one of Midas's core values, which drives planning and development of the Stibnite Gold Project.  Midas has integrated conservation values into the Stibnite Gold Project, which include protecting and improving local surface water and groundwater quality, and repairing, relocating, or constructing new ecologically diverse stream channels and wetlands to mitigate those disturbed by legacy and new mine development.

93.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that discharges from the from the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel will undermine Midas's efforts and vision to restore the Site, water quality, and environment concurrent with all mining phases.  Such discharges would also harm Midas's ability to rehabilitate the salmon fishery in the District and create a sustainable ecosystem at the Site.

94.     Midas has already expended significant resources to study and develop proposed methods to address water quality issues in the District.  Midas will continue to expend resources to address water quality during the lifetime of the Stibnite Gold Project.

95.     The Hangar Flats Tailings Pile, DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel are upstream of portions of lands subject to IGRC and SGC's patented claims in the District.  Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that the discharges from these locations are negatively impacting the water quality at the Site.  Such discharges harm IGRC and SGC's property interests.

96.     Midas may be forced to incur significant additional costs to remedy the water impacted by the discharge of pollutants at the Hangar Flats Tailings Pile, DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel.

97.     Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that the discharges from the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel will cause MGII to perform additional work to address water quality issues at the Site.

**The Tribe's Suit**

98.     On June 5, 2019, the Forest Supervisor of the Payette National Forest was copied on a Notice of Intent ("NOI") sent by the Tribe to Midas.  In that NOI, the Tribe gave notice of its intent to bring an action under the CWA for alleged unpermitted point source discharges.  The Tribe asserted in the NOI that "Midas Gold is responsible for all of the discharges listed below because they are all located on lands within the control of Midas Gold."  *See* Ex. A, Attach. A, 60-Day Notice of Intent to Sue for Violations of the Clean Water Act, at 5.

99.    On August 8, 2019, the Tribe filed a Complaint in the United States District Court for the District of Idaho asserting those claims. *See* Exhibit B ("Ex. B"), Tribe's Complaint.

100.    The Tribe has alleged that Midas has violated 33 U.S.C. § 1311(a), which prohibits the discharge of "any pollutant by any person" into navigable waters unless in compliance with NPDES permitting requirements. 33 U.S.C. §§ 1311(a), 1342. Those requirements obligate owners and/or operators of a polluting facility to obtain a permit authorizing point source pollution discharges. *See* Idaho Admin. Code §§ 58.01.25.102.01, 58.01.25.010.62; 40 C.F.R. § 122.2. The Tribe claims that Midas owns and operates eight point sources that are alleged to be discharging pollutants into navigable waters on the Site.

101.    Specifically, the Tribe alleges that aluminum, antimony, arsenic, cyanide, iron, manganese, mercury, and thallium are being discharged into the EFSFSR, Keyway Marsh, Meadow Creek, and Sugar Creek from each of the eight alleged point sources, and that each of the alleged point sources added pollutants to a water of the United States via one or more discernible, confined, and discrete conveyances. *See* Ex. B ¶¶ 95–97.

102.    The NOI states that discharges continue to occur from each alleged point source. *See* Ex. A, Attach. A at 5–13. The Tribe also alleges that these discharges have occurred continuously or intermittently for at least five years preceding the date of its August 2019 Complaint. *See* Ex. B ¶¶ 49–87.

103.    Midas answered the Tribe's Complaint on January 7, 2020. *See* Exhibit C. Midas lacked sufficient information to admit or deny many of the Tribe's allegations and is continuing to investigate the factual basis for the Tribe's allegations, including those related to the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel.

104.     If the Tribe's allegations regarding the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel are true, then point sources located on lands owned and operated by the United States and USFS are impacting water quality at the Site, including in streams and rivers that pass through patented lands held by IGRC and SGC, and subjecting Midas to potential clean-up costs and penalties associated with those discharges.

105.     Upon information or belief, historic operations or approvals by USFS may also have caused or exacerbated water quality issues at the Site, including for the locations where the Tribe is alleging that Midas is violating the CWA.

106.     The Tribe's Suit demands that Midas remediate surface seeps, the surface flow of water, and rock piles, any of which would involve substantial disruption of the surface estate, and would trigger the requirement that Midas secure permits from USFS authorizing such work.

107.     If the Tribe obtained the full relief it requests, Midas would thus be in an untenable position.  Complying with the injunction would require Midas to disregard the permitting requirement for lands that Midas does not own.

108.     Likewise, complying with the permitting requirement could put Midas in violation of the injunction because even if Midas were to submit a proposal to USFS explaining the proposed remediation activities and their potential impacts on the surface estate, *see* 36 C.F.R. §§ 228.4–228.5, USFS could lawfully deny Midas's proposal outright or substantially alter it so that it no longer complies with the underlying court order.

**JURY DEMAND**

109.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs in this matter demand a jury trial on all counts, issues, and matters triable by jury in this case.

**CLAIM FOR RELIEF**

**Violations of CWA § 301(a), 33 U.S.C. § 1311(a)**

110.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

111.    Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that Defendants have violated and will continue to violate the CWA, 33 U.S.C. § 1311(a), by discharging pollutants from the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel in the District into navigable waters without a valid NPDES permit(s) authorizing the discharges.

112.    At least one of these properties has contributed pollutants regularly or continuously for at least the last five years, with such contributions ongoing now, and Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that such contributions will continue into the future, unless the Court grants relief as requested herein.

113.    Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that these violations are violations of an "effluent standard or limitation" as defined by the CWA.  33 U.S.C. § 1365(f).

114.    Defendants are "persons" under the CWA. 33 U.S.C. § 1362(5).

115.    Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that Defendants are an owner and/or operator of the facilities and activities where the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel discharges have occurred and will continue to occur in violation of CWA regulations.  40 C.F.R. § 122.2.

116.    Aluminum, antimony, arsenic, cyanide, iron, manganese, mercury, and thallium are pollutants under the CWA.  33 U.S.C. § 1362(6).

117.    The EFSFSR, Sugar Creek, and Meadow Creek are "navigable waters" under the CWA.  33 U.S.C. § 1362(7).

118.    Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel are point sources that discharge pollutants under the CWA.  33 U.S.C. § 1362(12), (14).

119.    Plaintiffs are harmed by Defendants' contributions and possible CWA violations, and seek declaratory and injunctive relief, as set forth below, plus an award of civil penalties for each and every CWA violation for the last five years and for each ongoing and future violation that occurs until judgment is entered in this case.

120.    Midas will likely have evidentiary support after a reasonable opportunity for further investigation or discovery that Defendants' ongoing contributions and CWA violations threaten continuing and irreparable harm to the EFSFSR and to Plaintiffs' interests, warranting the entry of declaratory relief, injunctive relief and/or an award of civil penalties under the CWA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief:

A.    Declare, hold, and adjudge that the United States and USFS are the owners and/or operators of the portions of the Hangar Flats Tailings Pile on NFS land, the entire DMEA Adit and Waste Rock Dump, the Bonanza Adit, the Cinnabar Tunnel, and for purposes of the CWA;

B.    Declare, hold, and adjudge that Defendants are in violation of CWA Section 301, 33 U.S.C. § 1311(a), by discharging pollutants from the Hangar Flats Tailings Pile, the DMEA Adit and Waste Rock Dump, the Bonanza Adit, and the Cinnabar Tunnel without a valid NPDES permit(s);

C.      Assess civil penalties, to be awarded to the U.S. Treasury, against Defendants, for each CWA violation committed over the last five years, and each similar violation committed by Defendants until judgment is entered by this Court, pursuant to Section 309 of the CWA, 33 U.S.C. § 1319(d);

D.      Enjoin Defendants under Section 505 of the CWA, 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201–2202, from further discharging pollutants to the EFSFSR, Sugar Creek, Meadow Creek, and any other navigable waters except as expressly authorized by the CWA in compliance with, and the limitations and conditions of, all applicable NPDES permit(s);

E.      Enjoin Defendants under CWA Section 505, 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201–2202, to take specific actions to evaluate and remediate the environmental harm caused by their CWA violations, to provide pollution monitoring and mitigation measures, and to implement any additional measures necessary to ensure Defendants' compliance with the CWA;

F.      Enjoin Defendants under CWA Section 505, 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201–2202, to provide any approvals or authorizations necessary for Midas to comply with any injunctive relief ordered by the Court in *Nez Perce Tribe v. Midas Gold Corp.*, No. 01:19-cv-307 (D. Idaho);

G.      Grant such other preliminary and/or permanent injunctive relief as Plaintiffs may from time to time request during the pendency of this case to prevent further harm to the EFSFSR and Plaintiffs' interests;

H.      Award Plaintiffs their reasonable litigation costs and expenses, including attorney and expert fees, incurred in bringing this action under CWA Section 505(d), 33 U.S.C. § 1365(d) and any other applicable cost and fee recovery statutes; and

I.      Award such other relief as the Court may deem just and proper.

DATED this 18th day of August 2020.

GIVENS PURSLEY LLP

*/s/ Preston N. Carter*
Christopher H. Meyer
Preston N. Carter

*Attorneys for Plaintiffs*